UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
MAUREEN E. ALBRIGHT,                                    Chapter 13
                    DEBTOR.                             Case No. 11-20457-WCH

_____

## MEMORANDUM OF DECISION

## I. INTRODUCTION

The matter before the Court is the "Debtor, Maureen E. Albright's Motion for Summary Judgment" (the "Motion for Summary Judgment") filed by Maureen E. Albright (the "Debtor") and the "Claimants', Lionel Vigroux and Jocelyn Boutot's Opposition to Summary Judgment" (the "Opposition") filed by the Lionel Vigroux ("Vigroux") and Jocelyn Boutot ("Boutot," collectively with Vigroux, the "Claimants").  Through the Motion for Summary Judgment, the Debtor seeks a determination of the amount of the Claimants' claims against her for unpaid wages.  For the reasons set forth below, I will grant the Motion for Summary Judgment in part.

## II. PRELIMINARY MATTERS

A. The Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  "A 'genuine' issue is one supported by such evidence that 'a reasonable jury, drawing favorable inferences,' could resolve it in favor of the

---

[1] Fed. R. Civ. P. 56(a), made applicable in adversary proceedings by Fed. R. Bankr. P. 7056.

nonmoving party."[2]  Material facts are those having the potential to affect the outcome of the suit

under the applicable law.[3]  The United States Court of Appeals for the First Circuit has explained

this provision to mean that the absence of a material factual dispute is a "necessary condition,"

but not a "sufficient condition" to summary judgment.[4]  The moving party, therefore, must show

that it is entitled to judgment as a matter of law.[5]

     B. Local Rule 56.1

     Pursuant to Local Rule 56.1 of the United States District Court for the District of

Massachusetts ("Local Rule 56.1"), adopted and made applicable to proceedings in the

Bankruptcy Court by Massachusetts Local Bankruptcy Rule ("MLBR") 7056-1, motions for

summary judgment must include "a concise statement of the material facts of record as to which

the moving party contends there is no genuine issue to be tried, with page references to

affidavits, depositions, and other documentation."[6]  Failure to include such a statement

constitutes grounds for denial of the motion.[7]  Oppositions to summary judgment must similarly

contain a statement of material facts to which the opposing party contends that there exists a

genuine issue to be tried, with supporting references to the record.[8]  Material facts set forth in the

moving party's statement are deemed admitted for purposes of summary judgment if not

---

[2] *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d. 1, 2 (1st Cir. 1999) (*quoting Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 427 (1st Cir. 1996)).

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 314-315 (1st Cir. 1995); *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993).

[4] *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir.1994).

[5] *Id.*

[6] LR, D. Mass 56.1, adopted and made applicable to proceedings in the Bankruptcy Court by MLBR 7056-1.

[7] *Id.*

[8] *Id.*

2

controverted by an opposing statement.[9]   The purpose of this rule is "to prevent parties from shifting to the . . . court the burden of sifting through the inevitable mountain of information generated by discovery in search of relevant material."[10]

In the present case, the Debtor filed "Debtor, Maureen E. Albright's Local Rule 56.1 Concise Statement of Undisputed Material Facts" containing citations to her affidavits as to each claim.[11]   The Claim Affidavits (as defined below), in turn, contain citations to the Claimants' time sheets and evidence of payment.   The Claimants neither filed their own statement pursuant to Local Rule 56.1, nor filed a statement controverting the Debtor's statements.[12]   Nevertheless, the Claimants dispute many of the Debtor's factual assertions as being unsupported and, in fact, contrary to the documents attached to the Claim Affidavits.   This is sufficient to controvert the her statement as it is elementary that a fact that is not adequately supported cannot be deemed admitted under Local Rule 56.1.

That said, the parties agree that there are no disputed facts and that this matter is ripe for summary judgment.[13]   Indeed, the parties insist that the documents attached to the Claim Affidavits are sufficient for me to calculate the Claimants' claims.[14]   Therefore, I understand the

---

[9] *Id.*

[10] *Rios-Jimenez v. Principi*, 520 F.3d 31, 39 (1st Cir. 2008).

[11] Debtor, Maureen E. Albright's Local Rule 56.1 Concise Statement of Undisputed Material Facts ("Statement of Facts"), Docket No. 243.  *See also* Affidavit of Maureen E. Albright as to Claims of Jocelyn Boutot (the "Boutot Claim Affidavit"), Docket No. 245; Affidavit of Maureen E. Albright as to Claims of Lionel Vigroux (the "Vigroux Claim Affidavit," collectively with the Boutot Claim Affidavit, the "Claim Affidavits"), Docket No. 246.

[12] They did, however, attach a few documents to the Opposition.

[13] Trans. Mar. 21, 2013 at 8:21-25; 9:1-6, 9-13.

[14] Prior to the Court taking the Motion for Summary Judgment under advisement, the Debtor unsuccessfully sought to obtain documentation from the Claimants regarding their claims.  Statement of Facts, Docket No. 243 at ¶ 11.  At a hearing held on March 21, 2013, the Claimants' counsel conceded that they have no records and "don't have [a] real good memory" of what was paid to them.  Trans. Mar. 21, 2013 at 9:18-20.

dispute to be solely related to the liquidation of the claims and not one implicating a genuine issue of material fact.

## III. BACKGROUND

A. Factual History

The Debtor was the president of Tremont Caulking and Coating, Inc. ("Tremont"), a corporation which provided waterproofing services for several public projects.[15]   The Claimants were employees of Tremont for approximately five months in the fall of 2010.[16]   During their employment, the Claimants primarily worked on two jobs—the Howe Manning School in Middleton, Massachusetts (the "School Project") and the Joint Force Headquarters Project in Lexington, Massachusetts (the "JFHQ Project").[17]   Both jobs were classified as prevailing wage jobs pursuant to Mass. Gen. Laws ch. 149, § 27, for which the Massachusetts Commissioner of the Division of Occupational Safety set the hourly wage rates.[18]   Additionally, pursuant to Mass. Gen. Laws ch. 151, § 1A, the Claimants were entitled to one and a half times their hourly rate for any hours worked in excess of forty in one week.[19]   The hourly rate for the School Project was $69.91, while the hourly rate for the JFHQ Project was $65.00.[20]   The parties agree that the appropriate "half-time" rate to be applied to the Claimants' overtime is $33.53, one half the

---

[15] Claim Affidavits, Docket Nos. 245, 246 at ¶ 1; Statement of Facts, Docket No. 243 at ¶ 1.

[16] Statement of Facts, Docket No. 243 at ¶ 1.

[17] Claim Affidavits, Docket Nos. 245, 246 at ¶ 3.

[18] Statement of Facts, Docket No. 243 at ¶ 2.  *See* Mass. Gen. Laws ch. 149, § 27.

[19] *See* Mass. Gen. Laws ch. 151, § 1A ("Except as otherwise provided in this section, no employer in the commonwealth shall employ any of his employees in an occupation, as defined in section two, for a work week longer than forty hours, unless such employee receives compensation for his employment in excess of forty hours at a rate not less than one and one half times the regular rate at which he is employed.").

[20] Statement of Facts, Docket No. 243 at ¶ 2; *see also* Opposition, Docket No. 256-3 at Ex. 3 (prevailing wage rates for the School Project).

4

blended hourly rate of the two projects.[21]  When not working on these projects, the Claimants

earned $18.00 per hour for the same services (the "Regular Rate").[22]

Ultimately, Tremont experienced severe financial distress and ceased operating in

December, 2010.[23]  It is undisputed that at the time Tremont closed, the employees were not

fully paid.  As a result, the Claimants and other employees filed a complaint with the Office of

the Attorney General of the Commonwealth of Massachusetts (the "Attorney General") for

unpaid wages pursuant to Mass. Gen. Laws ch. 149, § 2 the following spring.[24]  The Attorney

General, with the Debtor's participation, conducted an "extensive audit" of Tremont that resulted

in the issuance of three citations against the Debtor personally, as a responsible officer of

Tremont, for willful violations of Mass. Gen. Laws ch. 149, §§ 27 and 27B on May 9, 2011 (the

"Citations").[25]  In addition to imposing civil penalties in the amount of $45,000.00, the Attorney

General ordered the Debtor to pay restitution to employees who were not paid prevailing wages

---

[21] Debtor Maureen E. Albright's Reply to Claimants, Lionel Vigroux and Jocelyn Boutot's Opposition to Summary Judgment (the "Reply"), Docket No. 272 at ¶ 7; Opposition, Docket No. 256 at p.2.  Curiously, $33.53 is not one half the average of the two relevant prevailing rates.  Admittedly, this figure is only off by about 20 cents, but is nevertheless indicative of the bigger problems in this case.  In any event, because the parties have agreed on this figure, I will accept it as the appropriate rate.

[22] Statement of Facts, Docket No. 243 at ¶ 2.

[23] *Id.* at ¶ 4.  In the Claims Affidavits, the Debtor explains that Tremont suffered significant losses for over runs for which Tremont was not fully paid.  Claims Affidavits, Docket Nos. 245, 246 at ¶ 9.

[24] Statement of Facts, Docket No. 243 at ¶ 3.

[25] *Id.* at ¶ 7, Ex. 1.  Mass. Gen. Laws ch. 149, § 27B provides in relevant part:

> Every contractor, subcontractor or public body engaged in said public works to which sections twenty-seven and twenty-seven A apply shall keep a true and accurate record of all mechanics and apprentices, teamsters, chauffeurs and laborers employed thereon, showing the name, address and occupational classification of each such employee on said works, and the hours worked by, and the wages paid to, each such employee, and shall promptly furnish to the attorney general or his representative, upon his request, a copy of said record, signed by the employer or his authorized agent under the penalties of perjury. . . .  Every contractor and subcontractor required to keep such a record shall submit a copy of said record to the awarding authority directly on a weekly basis. . . .

Mass. Gen. Laws ch. 149, § 27B.

for work performed on the School Project and the JFHQ Project between September 1, 2010 and December 4, 2010.[26] Attached to the Citations were charts, one for each project, containing two columns of numbers: "Direct Restitution Paid" and "Total Outstanding Wages" for each of Tremont's employees. The following table consolidates the information with respect to the Claimants as it appears on each attached chart:[27]

| Employee | Project | Direct Restitution Paid | Total Outstanding Wages |
|----------|---------|------------------------:|------------------------:|
| Lionel Vigroux | School Project | $13,022.36 | $4,639.19 |
| | JFHQ Project | $1,588.53 | $0.00 |
| Jocelyn Boutot | School Project | $11,478.39 | $4,687.92 |
| | JFHQ Project | $1,517.56 | $0.00 |

Although the Claimants filed complaints with the the Attorney General, they never sought to commence and prosecute a civil action in their own names. There is no suggestion that they participated in the Attorney General's investigation of Tremont. Moreover, the Claimants did not appeal the Citations.[28]

In addition to the restitution orders and civil penalties imposed by the Attorney General, both the Internal Revenue Service and the Massachusetts Department of Revenue assessed Tremont's unpaid payroll tax liability and resulting penalties against the Debtor personally as the corporation's responsible person.[29]

---

[26] Statement of Facts, Docket No. 243 at Ex. 1.

[27] *Id.* at ¶¶ 8, 12, Ex. 1.

[28] At a hearing conducted on March 21, 2013, counsel to the Claimants indicated that his clients never received copies of the Citations. Trans. Mar. 21, 2013 at 11:3-9.

[29] *Id.* at ¶ 6; Claims Affidavits, Docket No. 245, 246 at ¶ 11; *see* Claims Nos. 1-2, 12-2.

B. Procedural History

The Debtor filed a Chapter 13 petition on November 3, 2011.  On February 12, 2012, Boutot and Vigroux, acting *pro se*, each filed proofs of claim for unpaid wages in the amounts of $15,861.00 and $15,583.00, respectively.[30]  On February 20, 2012, the Debtor moved to conduct examinations pursuant to Fed. R. Bankr. P. 2004 of several employees who had filed claims, including the Claimants.  I granted the motion on February 29, 2012.  The Claimants, however, did not appear at the scheduled examination.[31]

On April 10, 2012, the Debtor filed an omnibus objection to the Claimant's claims, requesting that they be disallowed in full.  As cause therefor, the Debtor disputed that the claims were entitled to priority status under 11 U.S.C. § 507(a)(4) in her bankruptcy insofar as the wages were due from Tremont, and asserted that the claims, as filed, provide no indication of the hours worked, the dates the alleged services were provided, or the rate of pay owed to them.  In the absence of a response from either of the Claimants, I sustained the Debtor's objection on May 14, 2012.

Just days later, on May 17, 2012, the Claimants each filed a motion to amend their respective claims, asserting, *inter alia*, that they had filed their claims *pro se* and now had retained counsel, Attorney Stanley Helinski ("Attorney Helinski").  I granted these motions on May 21, 2012.  The Claimants filed their amended proofs of claim on June 12, 2012.  In their amended claims, Boutot asserted he was owed $47,693.79, while Vigroux claimed $109,877.57.[32]  Both indicated on their respective claim forms that $11,725.00 of their claim was

---

[30] Claims Nos. 13-1, 14-1.

[31] Statement of Facts, Docket No. 243 at ¶ 11.

[32] Claim Nos. 13-2, 14-2.

entitled to priority treatment under 11 U.S.C. § 507(a)(4).  While neither claim included any supporting documentation, the Claimants attached their time sheets and a wage summary on Tremont letterhead to the motions to amend their respective claims.[33]   Notably, the documentation suggested that the amount owed to each Claimant was substantially less than the amounts claimed on the proofs of claim.

Also on June 12, 2012, the Claimants sought leave to file late objections to confirmation of the Debtor's Chapter 13 plan, which I granted on June 27, 2012.  On June 28, 2012, the Debtor filed responses to the Claimants' motions complaining that I had granted the Claimants' prior motion to amend their claims on only five days' notice after having previously sustained her objections, and requesting that I reconsider that order.  The Debtor further cited the Claimants' failure to attend the previously scheduled examinations or provide any of the requested documents.  The following day, I vacated my order granting the Claimants leave to file late objections to confirmation and scheduled the motions for hearing on August 2, 2012.

At the August 2, 2012 hearing, Debtor's counsel, Attorney Laurel Bretta ("Attorney Bretta"), explained that the Claimants had failed to provide her with the documentation she had previously requested or appear for the scheduled examinations.  She further stated that the documentation attached to the Claimants' motions to amend was inadequate because she was unable to reconcile their claims with documentation from the Attorney General's office. Attorney Bretta further requested that I order the Claimants to appear at an examination and provide the necessary documentation.  At the conclusion of the hearing, I ordered both Claimants to appear at examinations to be held on August 22, 2012, and provide Attorney Bretta the requested documents no later than August 20, 2012.

---

[33] Motion of Lionel Vigroux for Leave to Amend Proof of Claim, Docket No. 122 at Ex. 1; Motion of Jocelyn Boutot for Leave to Amend Proof of Claim, Docket No. 123 at Ex. 1.

On August 24, 2012, the Debtor filed an amended objection to Boutot's claim in which she asserted that Boutot again failed to provide adequate documentation of his claim and failed to appear at the scheduled examination.  Boutot filed an opposition the same day, arguing that all necessary documentation was already in the Debtor's hands and that Boutot was unavoidably detained at work and could not leave for fear of losing his job.  The Claimants' then filed motions for protective orders to which the Debtor objected.

I conducted a hearing with respect to the amended objection on October 11, 2012.  After hearing from both parties, I entered an pre-trial order scheduling the objections for an evidentiary hearing on January 14, 2013.  The motions for protective orders were subsequently denied.

Consistent with the deadlines set forth in the pre-trial order, the Debtor filed the Motion for Summary Judgment with respect to the claim objections on December 19, 2012.  The Claimants filed the Opposition on January 2, 2013.  Ultimately, the Motion for Summary Judgment was heard on March 21, 2013.[34]

At the March 21, 2013 hearing, Attorney Bretta started her argument by characterizing the present dispute as

> com[ing] down to what the amount is, what credits are due, and whether the statutory scheme permits a trebling of the damages, and if there is a trebling of the damages[,] whether those liquidated damages are general unsecured claims or whether they fit within the priority claims under [11 U.S.C. §] 507.[35]

She argued that the Attorney General's audit, as embodied within the Citations, is binding on the parties and sets Vigroux's and Boutot's claims at $4,639.19 and $4,687.92, respectively. Attorney Bretta further stated that while the records attached to the Claim Affidavits reflect that

---

[34] On January 2, 2013, I granted the Motion for Summary Judgment on the basis that no response had been filed.  It appears that prior to the docketing of my order, the Claimants filed the Opposition.  The Claimants subsequently moved for reconsideration asserting that they had, in fact, filed the Opposition.  I granted the motion for reconsideration after a hearing and rescheduled the Motion for Summary Judgment in the ordinary course.

[35] Trans. Mar. 21, 2013 at 3:5-10.

the claims should actually be a "little less" than the Citations, the Debtor was nevertheless willing to accept those figures.[36]   In closing, she conceded that the prevailing wage statute provides for the trebling of damages, but asserted that only the net wages should be trebled and only the net wages should be entitled to priority treatment.

Attorney Helinski agreed that the matter was ripe for summary judgment and that no material facts were in dispute.[37]   In contrast to Attorney Bretta, however, he contended that both the Citations and the Attorney General's audit were irrelevant to the calculation of the Claimants' claims.   Instead, Attorney Helinski urged that I simply look to the records attached to the Claim Affidavits and do the math.   He further argued that the prevailing wage statute mandates trebling of not only the wages, but also litigation costs and attorney's fees.   Moreover, Attorney Helinski posited that the gross, and not net, wages should be trebled, and that the entire amount is entitled to priority treatment.

Based upon the parties' representations that no material facts were in dispute, I took the matter under advisement.   I also afforded both parties the opportunity to file additional briefs by April 12, 2013, which neither did.

C. <u>The Record on Summary Judgment</u>

As previously stated, the Debtor attached the Claimants' time sheets to the Claim Affidavits.   These time sheets are identical to those attached the Claimants' motions to amend their respective claims.   As such, there can be no real dispute as to how many hours the Claimants worked on each project and when.   The following table reproduces the information

---

[36] *Id.* at 6:9-18.

[37] *Id.* at 9:12-13.

contained within the time sheets and provides the totals for both the regular time and overtime

worked:[38]

| Date | Job | Vigroux's Hours | Boutot's Hours |
|---|---|---|---|
| **Pay Period 1: 8/22/2010-9/4/2010** | | | |
| Sunday, August 29, 2010 | Regular | 8 | 0 |
| Monday, August 30, 2010 | School | 4 | 0 |
| Tuesday, August 31, 2010 | School | 9 | 0 |
| Wednesday, September 01, 2010 | School | 9 | 0 |
| Thursday, September 02, 2010 | School | 8.5 | 0 |
| Friday, September 03, 2010 | School | 8 | 0 |
| Saturday, September 04, 2010 | School | 7 | 7 |
| Weekly Subtotal | | 53.5 | 7 |
| Weekly Overtime | | 13.5 | 0 |
| **BIWEEKLY TOTAL** | | 53.5 | 7 |
| **Pay Period 2: 9/5/2010-9/18/2010** | | | |
| Sunday, September 05, 2010 | School | 8.5 | 8.5 |
| Monday, September 06, 2010 | | 0 | 0 |
| Tuesday, September 07, 2010 | School | 5.5 | 5.5 |
| Wednesday, September 08, 2010 | School | 7 | 7 |
| Thursday, September 09, 2010 | School | 8 | 8 |
| Friday, September 10, 2010 | School | 8 | 8 |
| Saturday, September 11, 2010 | School | 8 | 8 |
| Weekly Subtotal | | 45 | 45 |
| Weekly Overtime | | 5 | 5 |
| Sunday, September 12, 2010 | | 0 | 0 |
| Monday, September 13, 2010 | School | 8 | 8 |
| Tuesday, September 14, 2010 | School | 8 | 8 |
| Wednesday, September 15, 2010 | JFHQ | 8 | 8 |
| Thursday, September 16, 2010 | JFHQ | 11 | 11 |
| Friday, September 17, 2010 | School | 3 | 3 |
| | JFHQ | 3 | 3 |
| Saturday, September 18, 2010 | JFHQ | 3 | 3 |
| | School | 7 | 7 |
| Weekly Subtotal | | 51 | 51 |
| Weekly Overtime | | 11 | 11 |
| **BIWEEKLY TOTAL** | | **96** | **96** |

---

[38] Claim Affidavits, Docket Nos. 245, 246 at Tab 1.

| BIWEEKLY OVERTIME | | 16 | 16 |
|---|---|---|---|
| **Pay Period 3: 9/19/2010-10/2/2010** | | | |
| Sunday, September 19, 2010 | | 0 | 0 |
| Monday, September 20, 2010 | School | 3 | 3 |
| | JFHQ | 5.5 | 5.5 |
| Tuesday, September 21, 2010 | School | 2 | 2 |
| | JFHQ | 6.5 | 6.5 |
| Wednesday, September 22, 2010 | JFHQ | 11 | 11 |
| Thursday, September 23, 2010 | JFHQ | 8.5 | 8.5 |
| Friday, September 24, 2010 | JFHQ | 6 | 6 |
| | School | 3 | 3 |
| Saturday, September 25, 2010 | School | 10 | 10 |
| Weekly Subtotal | | 55.5 | 55.5 |
| Weekly Overtime | | 15.5 | 15.5 |
| Sunday, September 26, 2010 | | 0 | 0 |
| Monday, September 27, 2010 | JFHQ | 2 | 2 |
| | School | 4 | 4 |
| Tuesday, September 28, 2010 | School | 4 | 4 |
| Wednesday, September 29, 2010 | School | 8 | 8 |
| Thursday, September 30, 2010 | | 0 | 0 |
| Friday, October 01, 2010 | School | 4 | 4 |
| Saturday, October 02, 2010 | JFHQ | 10 | 10 |
| Weekly Subtotal | | 32 | 32 |
| Weekly Overtime | | 0 | 0 |
| **BIWEEKLY TOTAL** | | **87.5** | **87.5** |
| **BIWEEKLY OVERTIME** | | **15.5** | **15.5** |
| **Pay Period 4: 10/3/2010-10/16/2010** | | | |
| Sunday, October 03, 2010 | School | 2 | 2 |
| Monday, October 04, 2010 | JFHQ | 3.5 | 3.5 |
| Tuesday, October 05, 2010 | JFHQ | 7 | 7 |
| Wednesday, October 06, 2010 | | 0 | 0 |
| Thursday, October 07, 2010 | JFHQ | 8 | 8 |
| Friday, October 08, 2010 | JFHQ | 9 | 9 |
| Saturday, October 09, 2010 | JFHQ | 9 | 9 |
| Weekly Subtotal | | 38.5 | 38.5 |
| Weekly Overtime | | 0 | 0 |
| Sunday, October 10, 2010 | JFHQ | 9 | 9 |
| Monday, October 11, 2010 | JFHQ | 9 | 9 |
| Tuesday, October 12, 2010 | School | 9 | 9 |
| Wednesday, October 13, 2010 | School | 10 | 10 |
| Thursday, October 14, 2010 | School | 0 | 10 |

| | | | |
|---|---|---|---|
| Friday, October 15, 2010 | | 0 | 0 |
| Saturday, October 16, 2010 | | 0 | 0 |
| Weekly Subtotal | | 37 | 47 |
| Weekly Overtime | | 0 | 7 |
| **BIWEEKLY TOTAL** | | **75.5** | **85.5** |
| **BIWEEKLY OVERTIME** | | **0** | **7** |
| **Pay Period 5: 10/17/2010-10/30/2010** | | | |
| Sunday, October 24, 2010 | School | 9 | 9 |
| Monday, October 25, 2010 | School | 8 | 8 |
| Tuesday, October 26, 2010 | School | 8 | 8 |
| Wednesday, October 27, 2010 | | 0 | 0 |
| Thursday, October 28, 2010 | School | 8.5 | 8.5 |
| Friday, October 29, 2010 | | 0 | 0 |
| Saturday, October 30, 2010 | | 0 | 0 |
| Weekly Subtotal | | 33.5 | 33.5 |
| Weekly Overtime | | 0 | 0 |
| **BIWEEKLY TOTAL** | | **33.5** | **33.5** |
| **BIWEEKLY OVERTIME** | | **0** | **0** |
| **Pay Period 6: 10/31/2010-11/13/2010** | | | |
| Sunday, October 31, 2010 | | 0 | 0 |
| Monday, November 01, 2010 | | 0 | 0 |
| Tuesday, November 02, 2010 | School | 8 | 8 |
| Wednesday, November 03, 2010 | School | 8 | 8 |
| Thursday, November 04, 2010 | | 0 | 0 |
| Friday, November 05, 2010 | | 0 | 0 |
| Saturday, November 06, 2010 | School | 8 | 8 |
| Weekly Subtotal | | 24 | 24 |
| Weekly Overtime | | 0 | 0 |
| Sunday, November 07, 2010 | | 0 | 0 |
| Monday, November 08, 2010 | | 0 | 0 |
| Tuesday, November 09, 2010 | | 0 | 0 |
| Wednesday, November 10, 2010 | | 0 | 0 |
| Thursday, November 11, 2010 | School | 8 | 8 |
| Friday, November 12, 2010 | School | 8 | 8 |
| Saturday, November 13, 2010 | School | 4 | 4 |
| Weekly Subtotal | | 20 | 20 |
| Weekly Overtime | | 0 | 0 |
| **BIWEEKLY TOTAL** | | **44** | **44** |
| **BIWEEKLY OVERTIME** | | **0** | **0** |
| **Pay Period 7: 11/14/2010-11/27/2010** | | | |
| Sunday, November 14, 2010 | | 0 | 0 |

| | | | |
|---|---|---:|---:|
| Monday, November 15, 2010 | School | 8 | 8 |
| Tuesday, November 16, 2010 | | 0 | 0 |
| Wednesday, November 17, 2010 | | 0 | 0 |
| Thursday, November 18, 2010 | School | 8.5 | 8.5 |
| Friday, November 19, 2010 | School | 8.5 | 8.5 |
| Saturday, November 20, 2010 | | 0 | 0 |
| Weekly Subtotal | | 25 | 25 |
| Weekly Overtime | | 0 | 0 |
| Sunday, November 21, 2010 | | 0 | 0 |
| Monday, November 22, 2010 | JFHQ | 8 | 8 |
| Tuesday, November 23, 2010 | JFHQ | 6.5 | 6.5 |
| Wednesday, November 24, 2010 | | 0 | 0 |
| Thursday, November 25, 2010 | | 0 | 0 |
| Friday, November 26, 2010 | | 0 | 0 |
| Saturday, November 27, 2010 | | 0 | 0 |
| Weekly Subtotal | | 14.5 | 14.5 |
| Weekly Overtime | | 0 | 0 |
| **BIWEEKLY TOTAL** | | **39.5** | **39.5** |
| **BIWEEKLY OVERTIME** | | **0** | **0** |
| **Pay Period 8: 11/29/2010-12/4/2010** | | | |
| Sunday, November 28, 2010 | | 0 | 0 |
| Monday, November 29, 2010 | JFHQ | 6.5 | 6.5 |
| Tuesday, November 30, 2010 | JFHQ | 8.5 | 0 |
| Wednesday, December 01, 2010 | JFHQ | 0 | 6.5 |
| Thursday, December 02, 2010 | JFHQ | 6 | 6 |
| Friday, December 03, 2010 | | 0 | 0 |
| Saturday, December 04, 2010 | | 0 | 0 |
| Weekly Subtotal | | 21 | 19 |
| Weekly Overtime | | 0 | 0 |
| **BIWEEKLY TOTAL** | | **21** | **19** |
| **BIWEEKLY OVERTIME** | | **0** | **0** |

In sum, the time sheets indicate that Vigroux worked a total of 450.5 hours, 45 of which were overtime, while Boutot worked a total of 412 hours, 38.5 of which were overtime. Of the 450.5 hours Vigroux worked, 2 hours were spent on an undisclosed project at his regular rate, 278 hours were spent on the School Project, and the remaining 164.5 hours were on the JFHQ Project. Similarly, Boutot worked a total of 249.5 hours on the School Project and 162.5 hours

14

on the JFHQ Project. Applying the rates for each project, the time sheets indicate that the Claimants' gross earnings are:

|  | Vigroux | | | Boutot | | |
|---|---|---|---|---|---|---|
|  | Hours | Rate | Gross Wages | Hours | Rate | Gross Wages |
| Regular | 8 | $18.00 | $144.00 | 0 | 0 | $0.00 |
| School Project | 278 | $69.91 | $19,434.98 | 249.5 | $69.91 | $17,442.55 |
| JFHQ Project | 164.5 | $65.00 | $10,692.50 | 162.5 | $65.00 | $10,562.50 |
| Overtime | 45 | $33.53 | $1,508.85 | 38.5 | $33.53 | $1,290.91 |
| **Total:** | | | **$31,780.33** | | | **$29,295.95** |

In addition to the time sheets, the Debtor also attached the same wage summaries on Tremont letterhead that accompanied the Claimants' motions to amend their respective claims.[39] In several cases, the hours worked in each pay period as reflected on the wage summaries are substantially inconsistent with the time sheets. Nevertheless, the wage summaries, which were also reproduced in the Claim Affidavits, indicate that the Claimants earned the following amounts for each pay period:[40]

|  | Vigroux | | Boutot | |
|---|---|---|---|---|
| **Dates** | **Gross** | **Net** | **Gross** | **Net** |
| 8/22/2010-9/4/2010 | $3,254.46 | $2,188.51 | $476.07 | $386.49 |
| 9/5/2010-9/18/2010 | $6,528.96 | $4,120.48 | $6,528.96 | $4,120.48 |
| 9/19/2010-10/2/2010 | $6,011.29 | $3,574.84 | $6,011.29 | $3,574.84 |
| 10/3/2010-10/16/2010 | $4,312.64 | $2,941.88 | $5,011.74 | $3,396.58 |
| 10/17/2010-10/30/2010 | $2,341.99 | $1,753.88 | $2,341.99 | $1,791.15 |
| 10/31/2010-11/13/2010 | $2,586.67 | $1,905.73 | $2,586.67 | $1,943.17 |
| 11/14/2010-11/27/2010 | $2,272.47 | $1,710.24 | $2,272.47 | $1,747.68 |
| 11/29/2010-12/4/2010 | $1,419.77 | $1,089.02 | $1,279.17 | $959.37 |
| **Total** | **$28,728.25** | **$19,284.58** | **$26,508.36** | **$17,919.76** |

Although the Claimants also submitted these wage summaries, their figures do not rely or agree with them.

---

[39] *Id.*

[40] *Id.*

The wage summaries appear to have been prepared by reference to the Claimants' pay stubs, only six of which were attached to the Claim Affidavits. Having reviewed the pay stubs, numerous discrepancies are immediately apparent. First, the rates applied are inconsistent with the Debtor's Statement of Facts. For example, in the first pay period, Vigroux is paid $20.00 per hour for his regular, non-prevailing wage rate, rather than $18.00 as agreed by the parties.[41] Similarly, in the first two pay periods, both Claimants are paid an hourly rate of $68.01 for work performed on the School Project, not $69.91.[42] According to the schedule of prevailing wage rates for the School Project, which the Claimants attached to the Opposition as Exhibit 3, the applicable hourly rate for waterproofing services was $69.91 effective August 1, 2010, before the Claimants began working for Tremont.[43] Moreover, all six of the pay stubs for both of the Claimants reflect that the rate applied to the JFHQ Project was $65.59, not $65.00.[44]

Similarly, the hours reflected in the time sheets cannot be reconciled with the pay stubs. In sum, the pay stubs understate the hours worked by each Claimant by approximately 17 hours.[45] Curiously though, in Pay Period 3, Vigroux was paid for an additional six hours not reflected in his time sheets at his regular rate.[46] Additionally, in Pay Period 2, the pay stubs indicate that both Claimants were paid solely at a rate of $68.01 for 96 hours, despite the time

---

[41] *Id.*

[42] *Id.*

[43] Opposition, Docket No. 256-3 at Ex. 3.

[44] Claim Affidavits, Docket Nos. 245, 246 at Tab 1.

[45] *Id.*

[46] *Id.*

sheets reflecting that they worked at both the School Project and the JFHQ Project during that period.[47]

Lastly, the pay stubs clearly do not reflect that either Claimant was ever paid overtime.[48] While I have confirmed this by an independent calculation, it is also apparent on the face of the documents. For example, in Pay Period 2, the Claimants each worked 96 hours, an amount that necessarily includes some hours constituting overtime.[49] Nevertheless, the pay stub applies only a single rate ($68.01) to that time to determine the gross wages due.[50]

The Debtor also submitted records in the form of cancelled checks evidencing payments made by Tremont to each Claimant between September 10, 2010 and March 8, 2011.[51] She also asserts in her affidavits that additional cash payments were paid to the Claimants.[52] These records reflect that Vigroux was paid $15,811.02, while Boutot was paid $13,976.43 (the "Agreed Credits").[53] The Claimants do not dispute receiving these amounts, including the cash payments, and use them in their own calculations.[54]

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.* at Tab 2.

[52] Claim Affidavits, Docket Nos. 245, 246 at ¶ 14.

[53] Claim Affidavits, Docket Nos. 245, 246 at Tab 2.

[54] Opposition, Docket No. 256 at p.2.

Surprisingly, the amounts set forth in the Citations cannot be reconciled with the time sheets, wage summaries, or payment evidence submitted with the Claim Affidavits. To repeat, the attachments to the Citations stated the following:[55]

| Employee | Project | Direct Restitution Paid | Total Outstanding Wages |
|---|---|---|---|
| Lionel Vigroux | School Project | $13,022.36 | $4,639.19 |
| | JFHQ Project | $1,588.53 | $0.00 |
| Jocelyn Boutot | School Project | $11,478.39 | $4,687.92 |
| | JFHQ Project | $1,517.56 | $0.00 |

The Debtor's position is that the "Direct Restitution Paid" and "Total Outstanding Wages" columns, when added together, represent each Claimants' net wages. Therefore, according to the Attorney General's audit, Vigroux was owed a total of $19,250.08 and Boutot was owed a total of $17,683.87. While not identical, these figures are close to the net totals the Debtor calculated in the wage summaries and supported by the pay stubs. That, in and of itself, is baffling as the pay stubs did not calculate the correct number of hours, apply the correct rates, or pay overtime. The Debtor explains the disparity between the "Direct Restitution Paid" and the evidence of payment submitted to the Court by stating that the Attorney General did not credit the Debtor for certain cash payments. Even with the cash payments subtracted from the Agreed Credits, however, the sum, while close, does not match the "Direct Restitution Paid."[56]

The most perplexing aspect of the attachments to the Citations is the breakdown of the restitution for each project. Assuming, *arguendo*, that the columns reflect the net wages due each Claimant, it is immediately apparent that the stated amounts due for the JFHQ Project are grossly disproportionate to the hours worked as reflected in the Claimants' time sheets. Indeed,

---

[55] Statement of Facts, Docket No. 243 at Ex. 1.

[56] Vigroux received cash payments in the amount of $1,000.00, while Boutot received cash payments in the amount of $1,950.48. Claim Affidavits, Docket Nos. 245, 246 at ¶ 14, Tab 1. Subtracting those payments from the Agreed Credits, the evidence still shows that Vigroux was paid $14,811.02 and Boutot was paid $12,025.95. In contrast, the "Direct Restitution Paid" for Vigroux and Boutot are $14,610.89 and $12,995.95, respectively.

the "Direct Restitution Paid" for each Claimant represents less than 15% of the gross wages the time sheets suggest that the Claimants earned.  No explanation has been offered for this discrepancy in the allocation of the Claimants' time between the projects.

D. Further Briefing

Having reviewed the Claim Affidavits and the attachments thereto, and being mindful of the apparent inconsistencies, I concluded that the parties' positions with respect to several material issues had been inadequately developed in their papers.  Therefore, I ordered the parties to file supplemental briefs addressing four questions: (1) what effect, if any, do the Citations have on the Claimants' claims; (2) in the absence of a successful civil action against the Debtor, what is the basis for the Claimants' request for treble damages; (3) if treble damages are appropriate, how are they to be calculated; and (4) in what amount, if any, is the Debtor entitled to a credit against these claims for: (a) payments made on behalf of the Claimants to the taxing authorities; and (b) amounts for unpaid payroll taxes on these claims for which the Debtor has been personally assessed.

The parties timely filed their supplemental briefs, the content of which will be discussed further below.  Notably, in response to my fourth question, the Debtor indicated that she was entitled to a tax credit against Vigroux in the amount of $6,875.13 and Boutot in the amount of $6,143.17.  Rather than answer my question, the Claimants responded that they should be paid the gross amount of their wages, asserting that the Debtor cannot be trusted to make the payments herself.[57]

---

[57] In the Opposition, and again in their supplement brief, the Claimants raise allegations regarding the Debtor having filed fraudulent Form W-2 statements with the taxing authorities.  These allegations are irrelevant to the matter before me and need not be discussed further.

In response to my first question, however, the Claimants asserted that the Citations' restitution components were irrelevant because the Citations imposed only civil fines that will not be paid to the Claimants.  That response contradicted the concept of restitution and further added to the confusion.  To resolve the issue, I ordered the Debtor to obtain a statement from the Office of the Attorney General "indicating whether the Claimants have any right to the amounts paid by the Debtor pursuant to the orders of restitution contained within the Citations for Violations of Massachusetts Wage and Hour Laws."[58]

On August 29, 2013, the Debtor filed a report in accordance with my order.  The Attorney General answered that restitution in the amount of $20,619.59, the "Total Outstanding Wages" due for all employees, was still outstanding and would be dispersed to the employees once satisfied by the Debtor.[59]  The Debtor, seeking to further clarify the Attorney General's answer, reported that the unpaid balance of the restitution would not be paid to the Attorney General, but would instead be paid directly to the employees through the Debtor's Chapter 13 Plan.  Without regard to the Debtor's qualification, the Attorney General's response confirmed two things:  (1) that the Claimants do indeed have rights to the restitution amounts contained within the Citations; and (2) that the "Direct Restitution Paid" column of the attachments to the Citations represents amounts that have already been paid to the Claimants.

## IV. <u>POSITIONS OF THE PARTIES</u>

From the outset, I note that while I summarize the parties' arguments in this section, including how they reach the amounts they claim are due, my description is not meant to suggest that their respective calculations are at all accurate.  To the contrary, both have arithmetical

---

[58] Docket No. 294.

[59] Debtor, Maureen E. Albright's Report in Accordance with this Court's Order of July 17, 2013, Docket No. 307 at Ex. 3.

errors.   Nevertheless, I include this summary to show how each would have me calculate the claims.

A. <u>The Debtor</u>

The Debtor argues that the amounts due Vigroux and Boutot are those set forth in the Citations, $4,687.92 and $4,639.19, respectively.  She asserts that the Citations and the amounts reflected therein are the result of an extensive audit conducted by the Attorney General based upon complaints filed by the Claimants and others.   The Debtor posits that the Attorney General's findings are conclusive and binding, as the Claimants never availed themselves of their statutory right to appeal.   Therefore, she contends that the Claimants are precluded from disputing the amounts set forth in the Citations under either *res judicata* or collateral estoppel because the parties and issues are the same.  In support, the Debtor relies on *Stowe v. Bologna* for the proposition that a final order of an administrative agency in an adjudicatory proceeding is entitled to preclusive effect.[60]  She urges that it would be patently unfair to allow a party to obtain relief with an administrative body only to seek a second bite at the apple in the courts. Furthermore, the Debtor questions whether this Court has subject matter jurisdiction to alter the Attorney General's findings given that the statute designates the Attorney General as having the regulatory authority.

Alternatively, even if the Citations are not entitled to preclusive effect, the Debtor asserts that the business records submitted by all parties reflect that the Claimant's claims are inflated. Indeed, she states that the records indicate that she actually owes less to each Claimant than the Attorney General concluded because she was not given credit for certain cash payments. Moreover, the Debtor argues that because the Claimants acted to obstruct discovery, their claims

---

[60] *Stowe v. Bologna*, 415 Mass. 20, 22, 610 N.E.2d 961 (1993).

should be determined by the documentary evidence produced by the Debtor and the Claims Affidavits.

With respect to the Claimants' claim for overtime, the Debtor contends that the Claimants misapply the overtime rules and provide no evidence that any overtime is actually due. She explains that overtime is properly calculated by applying the appropriate straight time rate to all hours worked, then applying the blended rate of $33.53 to each hour over forty. In any event, the Debtor asserts that the Attorney General took overtime into account when issuing the Citations.

The Debtor further argues that the Claimants are not entitled to treble damages because they never commenced a civil action in their own names as Mass. Gen. Laws ch. 149, § 27 requires. She notes that the statute does not provide for the trebling of damages if the Attorney General finds a violation or simply because one is aggrieved. If, however, I find that trebling is appropriate, the Debtor contends that only the net outstanding wages would be trebled. Moreover, she asserts that only the wage portion of the claim would be entitled to priority treatment under 11 U.S.C. § 507(a)(4).

B. The Claimants

The Claimants urge me to ignore the Citations as being wholly irrelevant to the determination of their claims. They begin by asserting that the Citations constitute civil penalties and not restitution that will be paid to them. Next, the Claimants argue that *res judicata* is not applicable to the Citations because: (1) they were only witnesses, not parties to any action or administrative hearing; (2) no final judgment entered and no rulings followed the Attorney General's investigation; (3) the purpose of the Attorney General's investigation was to determine the Debtor's guilt, not the Claimant's claims; and (4) they did not initiate the action and were not

given due process.[61]   Instead, the Claimants urge me to simply look to their time sheets, which both parties have submitted, to calculate their claims.

Starting with Vigroux, the Claimaints assert he worked 164.5 hours at the JFHQ Project and 192.5 at the School Project.  Applying the appropriate rates, $65.00 for the JFHQ Project and $69.91 for the School Project, they calculate Vigroux's gross wages, exclusive of overtime, as $24,150.18.   The Claimants further state that Vigroux worked 116.6 overtime hours, which, applying a blended rate of $33.53, results in additional wages of $3,909.02.  Adding these figures together, they conclude Vigroux was owed a total of $28,059.19.  Deducting the Agreed Credit of $15,811.12, they calculate Vigroux's gross outstanding wages as $12,248.07.

Turning to Boutot, the Claimants state that the time sheets reflect that he worked 145 hours at the JFHQ Project and 223.5 hours at the School Project.  Applying the same rates, they calculate Boutot's gross wages, exclusive of overtime, as $25,049.89.  Moreover, they assert that Boutot worked 137.6 hours of overtime, which results in additional wages of $4,613.04.  Adding these figures together, they determine Boutot was owed a total of $29,662.93.  Once the Agreed Credit of $13,976.43 is subtracted, the Claimants conclude Boutot's gross outstanding wages are $15,686.50.

Having calculated the gross wages due, the Claimants argue that Mass. Gen. Laws ch. 149, § 27 mandates that they receive treble damages and reasonable attorneys' fees.  They further assert that the gross outstanding wages, not net, should be trebled, yielding claims of $36,744.21 and $47,059.50 for Vigroux and Boutot, respectively.  The Claimants posit that because the Debtor has stipulated to liability, a successful civil action is immaterial.   In this sense, they would have me read the success requirement in Mass. Gen. Laws ch. 149, § 27 as

---

[61] It is undisputed that the Claimants filed complaints with the Attorney General.

simply a requirement that the claim be proven, not necessarily reduced to a judgment.  Finally, they argue that everything should be given priority status under 11 U.S.C. § 507(a)(4).

Finally, the Claimants adopt somewhat contradictory positions with respect to affording the Debtor a credit for taxes.  On the one hand, they agree that the Debtor should be permitted to reduce their claims for taxes actually paid to the taxing authorities, but state that number is unknowable because the Debtor filed false Form W-2 statements.  In their supplemental brief, the Claimants further argue that it is unlikely that the Debtor will maintain payments under her Chapter 13 plan and therefore, should not be trusted with making payments on behalf of the Claimants.

## V. DISCUSSION

At this stage, I am compelled to note that the parties have made the determination of these claims more confused and complicated than it should have been.  Despite the fact that the parties rely on the same documents, they reach wildly divergent conclusions based upon them.[62] The Court's review of these documents establishes that both parties' positions are based upon a foundation of unsupported assumptions.  Indeed, as has been discussed at some length above, the documents contain a number of inconsistencies which neither party has acknowledged.[63]  For example, the Debtor insists that the Citations represent the end result of an extensive audit by the

---

[62] For this reason, I am not persuaded by the Debtor's complaints that the Claimants would not adequately participate in discovery.  Indeed, it is hard to fathom what documentation regarding their claims the Claimants would have had that would not have been a business record of Tremont and already in the possession of the Debtor.

[63] Generally speaking, "[a] proof of claim executed and filed in accordance with [Fed. R. Bankr. P. 3001(f)] shall constitute prima facie evidence of the validity and amount of the claim," Fed. R. Bankr. P. 3001(f), requiring an objecting party to produce "substantial evidence" to rebut this presumption of validity.  *See Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993).  "If the objection is substantial, the claimant 'is required to come forward with evidence to support its claims . . . and bears the burden of proving its claims by a preponderance of the evidence.'"  *American Express Bank, FSB, v. Askenaizer (In re Plourde)*, 418 B.R. 495, 504 (B.A.P. 1st Cir. 2009) (*quoting In re Organogenesis, Inc.*, 316 B.R. 574, 583 (Bankr. D. Mass. 2004)).  In this case, the parties have submitted the same evidence, but do not agree as to its import, rendering the burden of proof somewhat irrelevant.

Attorney General which takes into account the proper rates, hours, and overtime due each Claimant based upon the records submitted to this Court.   The timesheets and pay stubs, however, refute her assertions rather than support them.   Similarly, relying on the same documents as the Claimants, I cannot reconcile a single number—not even the total number of hours worked—from the Opposition.   Ultimately, given the inconsistencies in the evidence now before me, the calculation of these claims, at least as an initial matter, boils down to whether the Citations are entitled to preclusive effect against the Claimants.

    A. Preclusive Effect of the Citations

    It is well settled that bankruptcy courts give preclusive effect to state-law judgments whenever the courts of that state would do so.[64]   Therefore, "[u]nder Massachusetts law, the term 'res judicata' is commonly used to refer to two similar, but separate and distinct theories: claim preclusion and issue preclusion."[65]   Claim preclusion, commonly referred to as *res judicata*, "makes a valid, final judgment conclusive on the parties and their privies, and bars further litigation of all matters that were or should have been adjudicated in the action."[66]   To invoke *res judicata*, three elements must be present: "[(1)] identity of cause of action and issues, [(2)] the same parties, and [(3)] judgment on the merits by a court of competent jurisdiction."[67]   Issue preclusion, also known as collateral estoppel, bars "relitigation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or their privies."[68]   In Massachusetts, collateral estoppel applies where:

---

[64] *United States v. One Parcel of Real Property*, 900 F.2d 470, 473 (1st Cir. 1990); *see also* 28 U.S.C. § 1738.

[65] *In re Brennan*, 275 B.R. 172, 174 (Bankr. D. Mass. 2002).

[66] *Heacock v. Heacock*, 402 Mass. 21, 23, 520 N.E.2d 151, 152-53 (1988).

[67] *Franklin v. N. Weymouth Co-op. Bank*, 283 Mass. 275, 280, 186 N.E. 641, 643 (1933)

[68] *Heacock v. Heacock*, 402 Mass. at 25 n.2.

(1) there was a valid and final judgment on the merits; (2) the party against whom estoppel is asserted was a party to the prior litigation; (3) the issue in the prior adjudication is identical to the issue in the current litigation; and (4) the issue in the prior litigation was essential to the earlier judgment.[69]

Moreover, the Massachusetts Supreme Judicial Court has held that:

[A] final order of an administrative agency in an adjudicatory proceeding, not appealed from and as to which the appeal period has expired, precludes relitigation of the same issues between the same parties, just as would a final judgment of a court of competent jurisdiction.[70]

In sum, both theories generally require that the prior litigation involved the same parties, the same issues, and a final adjudication.

To put the Attorney General's investigation and the resulting Citations in context for this discussion, an examination of the relevant statutes is necessary.  The Massachusetts Prevailing Wage Statute creates the concept of "prevailing wages" for certain types of jobs and imposes a statutory obligation that all workers performing identified jobs on "public works" construction projects be paid pursuant to a wage schedule set by the Department of Labor Standards.[71]  The Attorney General is tasked with enforcing the Prevailing Wage Statute and is specifically granted "all the necessary powers therefor."[72]  Any person found to have violated the Prevailing Wage Statute is subject to criminal and civil penalties.[73]  As is relevant in this case, Mass. Gen. Laws ch. 149, § 27C(b)(1) provides that the Attorney General may, as an alternative to initiating a

---

[69] *McHeffey v. Pereira (In re Pereira)*, 428 B.R. 276, 281 (Bankr. D. Mass. 2010) (*citing Alba v. Raytheon Co.*, 441 Mass. 836, 842 (2004)).

[70] *Stowe v. Bologna*, 415 Mass. at 22 (*quoting Stowe v. Bologna*, 32 Mass. App. Ct. 612, 615, 592 N.E.2d 764 (1992)).

[71] Mass. Gen. Laws ch. 149, §§ 26-27; *see Mansfield v. Pitney Bowes, Inc.*, CIV.A. 12-10131-DJC, 2013 WL 947191, *3 n. 3 (D. Mass. Mar. 12, 2013); *George v. Nat'l Water Main Cleaning Co.*, CIV.A. 10-10289-DJC, 2013 WL 5205846, *2 (D. Mass. Sept. 16, 2013).

[72] Mass. Gen. Laws ch. 149, § 2.

[73] Mass. Gen. Laws ch. 149, § 27.

criminal proceeding, issue civil citations requiring that the infraction be rectified, restitution be made to the aggrieved party, and/or civil penalties be paid to the Commonwealth.[74]  "Any person aggrieved by any citation or order" may file "a notice of appeal with the attorney general and the division of administrative law appeals within ten days of the receipt of the citation or order."[75]

The Prevailing Wage Statute also grants aggrieved parties a private right of action. Pursuant to Mass. Gen. Laws ch. 149, § 27,

> [a]n employee claiming to be aggrieved by a violation of this section may, 90 days after the filing of a complaint with the attorney general, or sooner if the attorney general assents in writing, and within 3 years after the violation, institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief, for any damages incurred, and for any lost wages and other benefits. An employee so aggrieved who prevails in such an action shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits and shall also be awarded the costs of the litigation and reasonable attorneys' fees.[76]

In *Depianti v. Jan-Pro Franchising Int'l, Inc.*, the Supreme Judicial Court stated that "[t]he Attorney General's right to enforce G.L. c. 149 and the right of private citizens to enforce provisions of that chapter represent parallel and distinct enforcement mechanisms."[77]  It went on the explain that

> [t]he requirement that a plaintiff file a complaint with the Attorney General before bringing a private suit is intended simply to ensure that the Attorney General receives notice of the alleged violations, so that she may investigate and prosecute such violations at her discretion.  In this way, the statute ensures that private actions for wage violations do not come and go without the Attorney General ever being made aware of the alleged unlawful conduct.[78]

---

[74] Mass. Gen. Laws ch. 149, § 27C(b)(1).

[75] Mass. Gen. Laws ch. 149, § 27C(b)(4).

[76] Mass. Gen. Laws ch. 149, § 27.

[77] *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 465 Mass. 607, 612, 990 N.E.2d 1054, 1061 (2013).

[78] *Id.* (internal citation omitted).

Further, while analyzing Mass. Gen. Laws ch. 149, § 150,[79] a section granting a private right of action for violations of other sections of chapter 149 using almost identical language to Mass. Gen. Laws ch. 149, § 27, the Supreme Judicial Court recognized that

> [i]t does not provide a comprehensive remedial scheme to resolve claims outside a judicial forum. Rather, § 150 authorizes two types of actions that may come before a court, one brought by the Attorney General, the other by individual plaintiffs.[80]

With this statutory framework in mind, I conclude that the Citations are not entitled to preclusive effect against the Claimants.  There is no dispute that the Claimants filed complaints with the Attorney General that prompted an investigation resulting in the issuance the Citations. Nevertheless, as explained by the Supreme Judicial Court in *Depianti*, the Attorney General's investigation is not an administrative remedy for aggrieved parties, but a mechanism for the enforcement and vindication of the laws of the Commonwealth.[81]  Indeed, the Attorney General is under no obligation to even commence an investigation upon receipt of a complaint.[82]  When an investigation is commenced, as it was here, the complaining party does not control the investigation.  Moreover, while the Attorney General is authorized to issue civil citations in lieu

---

[79] Mass. Gen. Laws ch. 149, § 150 provides in relevant part:

> An employee claiming to be aggrieved by a violation of sections 33E, 148, 148A, 148B, 150C, 152, 152A or 159C or section 19 of chapter 151 may, 90 days after the filing of a complaint with the attorney general, or sooner if the attorney general assents in writing, and within 3 years after the violation, institute and prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action for injunctive relief, for any damages incurred, and for any lost wages and other benefits. An employee so aggrieved who prevails in such an action shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits and shall also be awarded the costs of the litigation and reasonable attorneys' fees.

Mass. Gen. Laws ch. 149, § 150.

[80] *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 465 Mass. at 613.

[81] *Id.* at 612.

[82] *Id.*

of commencing a criminal action, orders of restitution appear incidental to the enforcement of the law.   I am also wholly unpersuaded that the investigation, by itself, is an adjudicatory proceeding.   Therefore, I find that the Claimants are not in privity with the Attorney General, were not parties to the investigation, and that the Citations do not represent a final adjudication of the same claims and issues as are now before me.

### B. Claimants' Entitlement to Treble Damages

The Claimants argue that they are entitled to an award of treble damages and reasonable attorneys' fees under the Prevailing Wage Statute.   As explained above, Mass. Gen. Laws ch. 149, § 27 provides that an aggrieved employee may file a civil action in his own name and on his own behalf after filing a complaint with the Attorney General.[83]   The Prevailing Wage Statute further provides:

> An employee so aggrieved *who prevails in such an action* shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits and shall also be awarded the costs of the litigation and reasonable attorneys' fees.[84]

The plain text of Mass. Gen. Laws ch. 149, § 27 expressly conditions an award of treble damages and attorneys' fees on prevailing in a civil action under that section.   Here, the Claimants never filed a civil action.   Nevertheless, they argue that this failure is immaterial, positing that the Prevailing Wage Statute simply requires that liability be proven.   I disagree. The statutory text is unambiguous and clearly requires an employee to prevail in a civil action. Not having filed one, the Claimants may not add treble damages or reasonable attorneys' fees to their claims.[85]

---

[83] Mass. Gen. Laws ch. 149, § 27.

[84] *Id.* (emphasis added).

[85] Because I conclude that the Claimants are not entitled to treble damages, I need not reach the subsidiary issues of how those damages would be calculated or whether they would be entitled to priority status.

C. Calculation of the Claims

Having concluded that the Citations do not bar the Claimants from claiming an amount different from the "Total Outstanding Wages" reflected therein, I must, as the parties have suggested, turn to Tremont's business records.  Based on my own review of the Claimant's time sheets, and applying rates in the amount of $18.00 per hour for regular non-prevailing rate jobs, $69.91 per hour for the School Project, $65.00 per hour for the JFHQ Project,[86] and $33.53 per hour for overtime, the Claimants' gross earnings are:

|  | Vigroux | | | Boutot | | |
|---|---|---|---|---|---|---|
|  | Hours | Rate | Gross Wages | Hours | Rate | Gross Wages |
| Regular | 8 | $18.00 | $144.00 | 0 | 0 | $0.00 |
| School Project | 278 | $69.91 | $19,434.98 | 249.5 | $69.91 | $17,442.55 |
| JFHQ Project | 164.5 | $65.00 | $10,692.50 | 162.5 | $65.00 | $10,562.50 |
| Overtime | 45 | $33.53 | $1,508.85 | 38.5 | $33.53 | $1,290.91 |
| **Total:** | | | **$31,780.33** | | | **$29,295.95** |

Therefore, subtracting the Agreed Credits from these figures yields the following gross wage balances:

|  | Vigroux | Boutot |
|---|---|---|
| Total Gross Wages | $31,780.33 | $29,295.95 |
| Agreed Credit | $15,811.02 | $13,976.43 |
| **Gross Wage Balance** | **$15,969.31** | **$15,319.52** |

Despite the Claimants' urging, they are not entitled to gross wages.  To the extent that the Debtor has been personally assessed the unpaid withholding taxes and has paid amounts to the taxing authorities, the Claimants' gross wages must be further reduced.[87]  In her supplemental

---

[86] It is unclear why Tremont would have been paying the Claimants $65.59 per hour as reflected in their pay stubs if the correct rate was less.  Nevertheless, the Claimants' pleadings repeatedly reference $65.00 per hour as the correct rate, so that is the rate I will apply.

[87] Paying the Claimants the gross amounts is nonsensical for two reasons.  First, the taxes have already been paid, so the gross amount is more than they are due.  Second, if they were paid the gross amount, the taxing authorities would recalculate the tax based on what the Claimants actually received.

brief, the Debtor stated that she has paid $6,875.13 on behalf of Vigroux and $6,143.17 on behalf

of Boutot.  Applying these amounts to the gross wage balances as reflected above, results in the

following net balance due:

|  | **Vigroux** | **Boutot** |
|---|---|---|
| Gross Wage Balance | $15,969.31 | 15,319.52 |
| Credit for Taxes Paid | $6,875.13 | $6,143.17 |
| **Net Balance Due** | **$9,094.18** | **$9,176.35** |

That would be the end of it, but for the fact that I found that the Claimants' total gross

wages are substantially higher than the Debtor calculated.  As a result, the Debtor must

recalculate her tax liability, which will likely result in the assessment of additional taxes.

Therefore, I will afford the Debtor a brief opportunity to file a statement indicating whether, and

in what amount, she is entitled to an additional tax credit based on my findings herein.

Finally, I note that the Debtor agrees that the Claimants' claims are entitled to priority

treatment up to the amount set forth in 11 U.S.C. § 507(a)(4); namely, $12,475.00.[88]

---

[88] Section 507(a)(4) provides fourth priority treatment for:

> allowed unsecured claims, but only to the extent of $12,475 for each individual or corporation, as
> the case may be, earned within 180 days before the date of the filing of the petition or the date of
> the cessation of the debtor's business, whichever occurs first, for--
>> (A) wages, salaries, or commissions, including vacation, severance, and sick leave pay
>> earned by an individual . . . .

11 U.S.C. § 507(a)(4).

## VI. <u>CONCLUSION</u>

In light of the foregoing, I will enter an order granting the Motion for Summary Judgment in part, and directing the Debtor to file a statement what, if any, additional tax credit must be applied to the net balances due as reflected above on account of my calculation of the Claimants' gross wages.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: November 19, 2013

Counsel Appearing:

> Laurel E. Bretta, Bretta & Grimaldi, P.A., Medford, MA,
>     for the Debtor
> Stanley Helinski, Helinski Law Offices, Boston, MA,
>     for the Claimants